(13 App. Div. 314.)

BLANCHARD et al. v. JEFFERSON.

(Supreme Court, Appellate Division, First Department. January 15, 1897.)

1. PARTNERSHIP—ACTION BETWEEN PARTNERS.

A balance shown by partnership books in favor of a deceased partner may, unless shown to be erroneous, be recovered in an action at law, without an accounting, though the accounts were kept by the deceased partner, where he had for more than 10 years been intrusted with entire charge of the accounts, and his co-partner neglected to examine them.

2. LIMITATION OF ACTIONS—PARTIAL PAYMENTS—AUTHORITY OF AGENT.

An agent who has the entire management of the principal's business has implied authority to make payments on an account due to himself from the principal, and therefore such payments prevent the running of the statute of limitations against the account.

Appeal from judgment on report of referee. ·

Action by Henry B. Blanchard and others, as executors of the will of Theodore A. Blanchard, deceased, against Susan Jefferson, individually, and as executrix of the will of John J. Jefferson, deceased, to recover a balance due on the dissolution of a partnership between plaintiffs' testator and defendant. From a judgment in favor of plaintiffs, defendant, individually, appeals. Affirmed.

So much of the opinion of WILLIAM G. CHOATE, Esq., to whom the action was referred to hear and determine, as is referred to in the opinion of the court, is as follows:

* * * On or about the 1st January, 1881, Blanchard opened an account with himself upon the books of Mrs. Jefferson, crediting himself with said sum of $14,651.92. He also credited himself with his salary, at the rate of $3,000 per year, such credits being generally made at intervals of six months, and also credited himself with interest, the interest being, for the first two periods of six months, the exact amount of the interest on $14,651.92 at 6 per cent. per annum; and thereafter the credits of interest were the sums of $425 every six months during a part of the time, and $400 during the residue of the time, these amounts being less than at the rate of 6 per cent. upon the apparent balance due to him in this account. He also charged himself for moneys drawn by him, which were not, however, drawn monthly, or at stated periods, but apparently as he required the money. Nor were the sums drawn charged as payments on account of salary, or on account of the former balance, or on account of interest. There is nothing on these charges of moneys drawn to indicate upon what account they are charged, other than that they are debits in the same account in which he is credited with the original balance, and with said amounts for salary and interest. The whole amount drawn and charged in account to him during the period of his employment exceeds the amount of his salary by $2,722.42. If applied upon the interest credit in the account, after payment of his salary, it amounts to a partial payment only of that interest. Blanchard died in March, 1891, and this suit was commenced by his executors in November, 1891, and they seek to recover upon two causes of action—First, the said balance of $14,651.92, as for money deposited with or lent to the defendant, with interest; and, secondly, for the salary of $3,000 per annum for the six years and six months. And they

allege that upon these two causes of action there has been paid the amounts which appear to have been drawn out by him in the account above referred to, leaving a balance upon both causes of action of $16,845.06. The defendant alleges that there was no balance due upon the close of the former partnership; that the accounts were falsely and fraudulently made up by Blanchard; that he has been fully paid his salary, and has overdrawn the sum of $2,722.42, which the defendant seeks to recover by way of counterclaim. Another counterclaim is set up in the answer, but no evidence is offered in its support. The defendant pleads the six-years statute of limitations to the plaintiffs' claim under the first cause of action. The proof is that the defendant took no active part in the business of the firm, that she left the management of it to Blanchard, and that she never saw the books till the trial of the action; and she seeks to defeat the first cause of action on the ground that there never was an accounting or a settlement of the affairs of the firm, nor an account stated between them, and also by proof of errors and frauds in the accounts. A clear prima facie case is made, in my opinion, for the plaintiffs, upon the partnership books, for their claim of the balance appearing by those books due to Blanchard on the 31st December, 1880. As stated in the defendant's answer, and as otherwise appears, she trusted implicitly in Blanchard to manage the business and keep the accounts; and after the lapse of more than ten years, and after the death of Blanchard, those books must be taken as correctly showing the transactions of the firm, and are evidence thereof against the defendant, whether she ever examined them or not. And the balance appearing thereby in favor of the deceased partner, Blanchard, is in the nature of an account stated, and can be recovered in an action at law, without a further accounting, unless it be shown by the defendant that it is erroneous or fraudulent. Heartt v. Corning, 3 Paige, 572; Cheever v. Lamar, 19 Hun, 132, 133. The books were openly kept, and Mrs. Jefferson had every opportunity to examine them. After this lapse of time, she must be regarded as having acquiesced in the entries so made. * * *

It is, however, claimed by the defendant that this cause of action is barred by the statute of limitations; that suit should have been brought upon it within six years from the 1st of January, 1881. The first question that arises in reference to the statute of limitations is, what was the nature of the indebtedness from Mrs. Jefferson to Mr. Blanchard, growing out of the dissolution of the former partnership, and her taking the assets? It is stated in the complaint as being a claim for money deposited with the defendant for use in the business. or loaned by Blanchard to the defendant. If it was a deposit, it would seem that the statute would not run against the plaintiffs' testator till a special demand. Payne v. Gardiner, 29 N. Y. 146. If it was a loan, the statute would run in six years from the date of the loan, unless prevented by a new acknowledgment or part payment. It seems to me, however, that the claim is rather in the nature of a stated account due for property sold by Blanchard to the defendant. The amount of this balance was the amount of Blanchard's interest in the assets of the firm at the time of the dissolution, as made up by the firm's regularly appointed bookkeeper. It is agreed by both parties that Mrs. Jefferson took those assets, and continued the business. It must have been upon an agreement which virtually amounted to a purchase of Blanchard's interest in the firm assets, and, while there was no written agreement to that effect, the circumstances and the acts of the parties show that Mrs. Jefferson agreed to buy out Blanchard's interest, and the law implies on her part a promise to pay for the same; and after this long acquiescence on Mrs. Jefferson's part, and no movement on her part to obtain a different settlement or valuation of his interest, which she purchased, such balance, against which no error or fraud is found, must be taken to be the price at which she purchased his interest.

It is claimed by the defendant that under the general employment of Blanchard by Mrs. Jefferson after January 1, 1881, he had no right to enter upon her books a credit to himself of this amount of his interest in the old firm. I think, however, it is quite clear that he had such a right. In employing him as bookkeeper and manager, she surely intended that he should keep a proper and true account of her business affairs,—at least, of her transactions in this wall-paper business; and an account of this indebtedness to him was an essential and proper part, or, if not an essential, certainly a proper, part of such an account. And, if this is so, it was further right for him, in pursuance of his agency, to credit to him-

self, at proper intervals, upon her accounts, the amount of his salary, which was agreed upon at $3,000 a year, and also to credit himself, and charge her upon the books, the accruing interest upon the amount due from her to him upon the purchase by her of his interest in the assets of the former firm.   The mode in which he kept the accounts from January 1, 1881, to June 30, 1887, shows clearly that he appropriated the moneys which he drew out of the firm upon both accounts,—that for salary, and that for interest and principal of the balance due from her to him on the 1st January, 1881; and I think he had a right to do so, by the terms of his employment.   An account had to be kept for her with himself, and she must be held to have intended that he should keep it.   There is no evidence or claim that any one else was employed or expected to do it.   Both the salary and the interest on the balance due him were expenses of the business.

It is claimed, however, that the bar of the statute is not avoided, because she never expressly consented to these entries, nor to the payment to him of more than his salary, and that he could not, by a payment made by himself, as agent for her, to himself individually, avoid the bar of the statute.   The question, however, seems to be one of what authority she gave him in her business.   I think his power is the same as it would have been if, at the beginning of the term of his service, she had given him a written power of attorney, authorizing him to carry on the business for her, and then had left him, without interference, to continue the business for six years and a half, making no other provision whatever for the payment of the debt due to him for his share of the assets, or interest on it.   In such case it would seem that he could have paid himself interest on the debt due him, as well as any third party interest on the business debt due to such third party from her, out of her moneys coming into his hands.   There is no doubt that he did pay himself something more than his salary, even if all the payments are first charged against the salary.   An examination of his account shows that, if all payments made to himself are charged to salary account, there was no overpayment down to the month of November, 1882, but from that time forward the following amounts were paid to himself in excess of what was due him up to the time of such payments for his salary alone: December 31, 1882, $117.22; January 31, 1883, $467.22; February 28, 1883, $447.22; March 31, 1883, $517.22; April 30, 1883, $567.22; May 31, 1883, $637.22; June 30, 1883, $587.22; July 31, 1883, $787.22; August 31, 1883, $622.22; September 30, 1883, $372.22; October 31, 1883, $322.22; November 30, 1883, $72.22; December 31, 1883, $162.37; January 31, 1884, $212.37.   On the 7th February, 1884, Blanchard paid in $1,200, which was credited to him on account; and taking that credit into account, if all charges against him from that time are applied to the payment of salary, there was no overdraft till September, 1884, and on the 30th September, 1884, the sum of $12.37 had been paid to himself beyond what was due to him as salary.   On the 20th October he deposited a further sum of $500, with which he is credited as cash; and from that time, and till the month of February, 1885, there was no overdraft by him over and above what was due to himself as salary alone, but such overdrafts begin again in March 1885, and continue as follows:   March 31, 1885, $92.42; April 20, 1885, $242.42; May 31, 1885, $92.42; June 30, 1885, $42.42.   From that time forward he continued to draw less than the amount of his salary up to and including October, 1886; and on the 30th November, 1886, he had drawn out $272.42 in excess of what up to that time had been due to him as salary, and on the 31st December, 1886, had drawn out $422.42 in excess of what was due to him up to that time as salary.   From the 31st December, 1886, to the 30th June, 1887, when he left the employ of Mrs. Jefferson, he overdrew his salary account by $2,300: making, with the $422.42 overdrawn on the 31st of the previous December, the $2,722.42 for which the defendant claims under her first counterclaim.   It is suggested by the defendant that the deposit of $1,200 on February 7, 1884, and of $500 on October 20, 1884, indicate that Blanchard knew he had overdrawn his salary, and that the object of these two deposits or payments in cash were for the purpose of making good these overdrafts.   There is, however, no evidence upon which such claim can be sustained.   There is no more reason to conclude that these sums were paid in for the purpose of reducing his drawings below the amount of his salary, than that they were paid in as loans to Mrs. Jefferson, or for the purpose generally of increasing the amount to his credit upon the accounts, or that, having the money, and no present use for it,

he simply deposited it with Mrs. Jefferson to his credit. The act of paying the money in is not an admission that he had improperly drawn moneys before, nor is it evidence from which such an admission can be inferred. It is true that it has been held that a ·payment of money by one person to another, without further proof, is presumed to have been paid under an obligation to pay. But here there are additional circumstances,—the existence of an account against which he was at liberty to draw, and one in which he had, during part of the time, left his money, namely, the arrears of his salary, at any rate, as in a bank or place of deposit. If there were an exact identity between the amounts so paid in and the overdrafts on account of salary, or if, immediately after an overdraft, he had made it good, there might be some ground for the inference that the payments were to meet these overdrafts, but there is no such relation between the two. When the first amount of $1,200 was paid in, he had overdrawn beyond the amount of his salary during more than a year, and the overdrafts had at one time exceeded $750, and had been reduced to $212.37. When he paid in the $500, he was thus overdrawn only $12.37. There is no such connection between these overdrafts and these deposits as constitutes evidence that the deposit was for the purpose of correcting or replacing those overdrafts. On the other hand, the appropriations thus openly made and charged against both items of indebtedness, the salary, and the old debt and interest on it in Mrs. Jefferson's books, open at all times to her inspection during a course of business lasting six years and a half, and being for long intervals of time in obvious excess of what he was entitled by their agreement to appropriate for his salary, are strong evidence of a claim of right on his part—not concealed from her, nor capable of being concealed from her, if she had shown any interest in the accounts—that he was entitled to draw against both claims, and to pay himself, as well, the interest on the balance due him on his salary. The question is one of his authority to pay such interest to himself, and, upon all the evidence, I am satisfied that he had such authority, and that these partial payments overcome the bar of the statute. I am not satisfied, upon all the evidence, that the defendant did not know that there was a considerable balance due to Blanchard on the old account, although she never saw that account; and I think she authorized him to pay this, as well as other business debts, out of the moneys which he received for·her. The defendant is bound by these acts of Blanchard, done by her authority, and the payments so made on account of the old debt, with her consent, avoid the bar of the statute. It is true that he was her confidential agent in all this business, bound to the utmost good faith, and the principle is not denied that a general power to act as attorney for another does not authorize the attorney to deal with himself. Bank of New York National Banking Ass'n v. American Dock & Trust Co., 143 N. Y. 559, 38 N. E. 713. But where it obviously was the intention of the parties that the attorney should, in a certain matter, deal with himself, that principle has no application; and the acts so done must have the usual consequences which attach to acts of the principal, where the acts were done in good faith, and in the regular course of business. Payment by an agent having authority to make the payment is effectual to avoid the statute. Bank v. Ballou, 49 N. Y. 155.

After Blanchard left, the defendant made one of her sons manager of the business; and he employed a new bookkeeper, who closed up Blanchard's account, which had been left on June 30, 1887, unbalanced. The new bookkeeper found evidence in the books of certain debits that should have been made to Blanchard, amounting to $427.33, and one credit omitted of $1. With these corrections, the balance to the credit of Blanchard June 30, 1887, stands on defendant's books at $16,845.06. A few checks are produced, drawn by Blanchard against Mrs. Jefferson's bank account, and on which he collected the money from the bank, which do not, apparently, correspond with any of the charges which he has made against himself for moneys drawn. He had, however, constant occasion to draw out money for the purpose of the business, and it does not appear that the money drawn on these checks was not used in the business.
\* \* \*

Argued before BARRETT, RUMSEY, WILLIAMS, O'BRIEN, and INGRAHAM, JJ.

John L. Hill, for appellant.

Charles E. Hughes, for respondents.

WILLIAMS, J. The action was brought to recover a balance alleged to have been owing by defendant, individually, to plaintiffs' testator, Blanchard, growing out of the following facts: The defendant was the wife of John J. Jefferson, who, in his lifetime, was engaged in the wall paper manufacturing business. Blanchard and one De Liew were employés of Mr. Jefferson in that business, during his lifetime. Mr. Jefferson died in November, 1868, leaving a will in which the defendant was named as executrix. January 1, 1869, the defendant, Blanchard, and De Liew entered into a copartnership, and continued the business of the late Mr. Jefferson until December 31, 1873, when De Liew retired, and the defendant and Blanchard entered into co-partnership under a written agreement to continue the business for five years from that time. The defendant was to contribute, as cash capital, $66,309, and Blanchard $13,370; these being the amounts standing to their credits, respectively, upon the closing of the books of the former co-partnership. The profits were to be divided equally. Blanchard was to conduct the business, but was to consult with defendant in cases of importance. Defendant was permitted to draw annually $3,600, and Blanchard $2,500, from the business. The business was carried on under this agreement for the five years, and until January 1, 1880. Blanchard acted as general manager, and kept the books, and, among them, the ledger, upon which the personal accounts of the partners appeared. Four sons of the defendant were employed in the business, one of whom assisted in keeping the books, but Blanchard alone had charge of the ledger. During the seven years this co-partnership continued, the accounts were closed at the end of each year, and the profits or losses, in equal proportions, were charged or credited to the partners, respectively. The accounts were so closed up at the termination of the co-partnership, December 31, 1880; and there was then standing to the credit of Blanchard the sum of $14,-651.92, as his share or interest in the business. Thereafter the business was continued by the defendant individually, she taking all the assets, and employing Blanchard, at a salary of $3,000, as manager. This relation continued until June 30, 1887, when Blanchard retired. During all this time, Blanchard acted as sole manager of the business, and kept the books, with the assistance of one of the defendant's sons, but Blanchard alone had charge of the ledger. On January 1, 1881, Blanchard opened an account with himself upon defendant's books, and credited himself with the sum of $14,651.92, balance stock account, which was the amount taken from the ledger of the co-partnership upon closing of their accounts. In this new account, Blanchard also credited himself at the end of each year with his salary, $3,000, and semiannually with interest on the stock balance, or on a lesser amount, and charged himself with the several amounts taken or drawn out by him from the business, simply stated in the account to be "cash." During the whole time the amount of cash

drawn by him exceeded the amount of his salary by $2,722.42, which was not, however, a sufficient amount to balance the interest charges in the account. Blanchard died in March, 1891, and in November, 1891, this suit was commenced to recover the balance of this account and interest, $16,845.06. The defense was that the statute of limitations had run against any claim made for the stock balance of $14,651.92, and that this amount, as entered upon the books, was, in any event, too large; and it was also sought to recover back the amount overdrawn by Blanchard, $2,722.42, and interest.

One of the questions arising on this appeal is whether the stock balance entered upon the books of the co-partnership as a credit to Blanchard was too large, as a matter of fact. Upon the trial some errors of computation were discovered, and plaintiffs made no objection to the corrections being made, on account thereof, by reducing such balance $78.39. The referee found no other errors in the account. It was claimed at the trial, and is now claimed here, that there was another serious error in making up this balance, by reason of an improper allowance for blocks and rollers. The blocks and rollers were wooden cylinders upon which the printing of the wall paper was executed. The seasons of wall-paper manufacture began in the summer (July), and extended until the following summer (July). New blocks and rollers were required every year, containing new patterns, and the old blocks and rollers were substantially of no value. Inventories were made each year as of January 1st, and in each inventory the blocks and rollers contained in the inventory of the preceding year were brought forward, and inserted in the new inventory at a valuation amounting to 80 per cent. of their valuation in such preceding inventory; and the blocks and rollers made during the year, and since the preceding inventory was made, were inserted in the new inventory at a valuation equal to their actual cost. In making up the merchandise account each year, the amount of the inventory of the preceding year was entered upon the debit side of the account, and the amount of the new inventory was entered on the credit side of the account. The balance of the merchandise account was carried into the profit and loss account, and the balance of the profit and loss account was carried into the account of the co-partners, which showed the stock balance of each co-partner. It is said that this rule as to the valuation of the old blocks and rollers was erroneous, and therefore the balance to the credit of Blanchard at the close of the co-partnership was too large. The claim made is that the entire amounts in the various inventories for old blocks and rollers should have been left out, and the new blocks and rollers made during the year preceding the inventory should be valued, not at their real cost, but, the year being half gone, at one-half such cost. This would be fair. These blocks and rollers had then been in use one-half a year,—from the July before,—were still in use, and would remain in use for another half year, until the following July. An examination of the figures, however, shows that this system of keeping the accounts would have been more favorable to the plaintiffs than the one which was ac-

tually adopted. Take the account as made up in January, 1875; strike out of the inventory then made the 80 per cent. of the old blocks and rollers, $6,514, and one-half of the valuation of the new blocks and rollers, $1,821, and the new inventory will thus be reduced, in all, $8,335. When this inventory is then carried into the merchandise account, the credit side of that account will be reduced by this amount. Leaving out of the merchandise account the valuation of the old blocks and rollers, taken from the inventory of the preceding year, will reduce the debit side of the merchandise account by the sum of $8,142. So that the net credit balance of the merchandise account in this year, to be carried to the profit and loss account, would be $193 less than appears by the books as they were kept. This change would be favorable to the defendant. And again, in 1876, the 80 per cent. was $8,125, and one-half new blocks and rollers $2,100, making total deduction in new inventory $10,225, while the total for old blocks and rollers by former inventory was $10,156, showing a net reduction of the credit balance for this year to be $69. This would also be favorable to the defendant. But in every succeeding year during the existence of the co-partnership the balance would be the other way. In 1877 the 80 per cent. was $9,860, and one-half the new blocks and rollers $2,000, making total deduction in new inventory $11,860, while the total for old blocks and rollers by the former inventory was $12,325. That would show an increase of the net balance to be carried to the profit and loss account of $465. In 1878 the 80 per cent. was $11,088, the one-half new blocks and rollers $2,000, making a total of $13,088, while old blocks and rollers in former inventory were $13,860, showing an increase of net balance of $772. In 1879 the 80 per cent. was $12,070.-40, one-half new blocks and rollers $2,350, making a total of $14,-420.40, while old blocks and rollers in former inventory were $15,088, showing an increase of net balance of $667.60. In 1880 the 80 per cent. was $13,416.32, one-half new blocks and rollers $2,185, making a total of $15,601.32, while old blocks and rollers in former inventory were $16,770.40, showing an increase of net balance of $1,169.08. And in 1881 the 80 per cent. was $14,228, one-half of new blocks and rollers $3,200, making a total of $17,428, while old blocks and rollers in former inventory were $17,785, showing an increase of net balance of $357. So that it is literally true, as stated by the referee, that the new system of figuring would be more favorable to the plaintiffs, and would show a greater stock balance to Blanchard's credit January 1, 1881, than did actually appear upon the books as he kept them; and this without changing the figures of the last year from 80 to 50 per cent. for the old blocks and rollers, as was done. We cannot change the stock balance to Blanchard's credit January 1, 1874, in any event, because that amount was expressly agreed upon in the letters of co-partnership. We have seen that the accounts as kept thereafter during the time of the co-partnership were fully as favorable to the defendant as the facts warranted. The amount of stock balance therefore to Blanchard's credit January 1, 1881, was not larger than it should have been.

The remaining questions in the case were discussed very fully and fairly by the referee in his opinion. We fully agree with him as to the conclusions at which he arrived, and can add nothing valuable to the suggestions made by him.

We think the judgment should be affirmed, with costs.

RUMSEY and O'BRIEN, JJ., concur.

INGRAHAM, J. (dissenting.) The complaint sets up two causes of action, the first of which presents the substantial question to be determined here. Thereby the plaintiffs seek to recover the amount due to the plaintiffs' testator from the defendant at the termination of a co-partnership which existed between them, and which was dissolved on the 31st day of December, 1880. Prior to the commencement of that co-partnership the parties to this action had been members of a co-partnership composed of the plaintiffs and the defendant and a third party, which was dissolved December 31, 1873, and a new co-partnership formed, which continued the business. The co-partnership articles recited that plaintiffs' testator contributed as capital to the new co-partnership $13,307, and that the defendant contributed to the new co-partnership $66,309,—these two amounts being the amount standing to their respective credits upon the books of the former co-partnership; this new co-partnership continuing for seven years, until the 31st day of December, 1880, when the co-partnership was dissolved, the defendant taking the business and continuing it in her own name. When the books were balanced at the termination of this co-partnership, there appeared to the credit of the plaintiffs' testator $14,651.92; and this action is brought to recover that balance, less several payments alleged to have been received by plaintiffs' testator on account thereof. There is no evidence of any express agreement between the co-partners at the time of the dissolution of this firm, no evidence of an accounting as between them, and no evidence as to the actual value of the property taken possession of by the defendant at the time of the dissolution of the co-partnership. It appears, however, that, upon the dissolution of this co-partnership, plaintiffs' testator continued as general manager of the business, which was thenceforth owned by the defendant; keeping the books, having sole charge of the business, drawing checks, paying bills, making purchases, being generally the only one in charge who had knowledge of the business, and who was responsible for its management. From December 31, 1880, until the plaintiffs' testator withdrew as such manager, in the year 1887, the books of the business were continued by the plaintiffs' testator. He opened an account in his own name, crediting himself with this amount which appeared upon the old books as the balance due him upon the termination of the co-partnership, crediting himself with his yearly salary as manager, and with one or two sums which he contributed in cash, and charging himself with the various amounts which he drew from the business during that period. No objection was made by the defendant to this method of procedure, but during all that

time it does not appear that there was ever an account rendered to the defendant by the plaintiffs' testator, or any one, of the condition of the business, or of the nature of these accounts; the defendant relying entirely upon the plaintiffs' testator, and receiving such sums of money from the business as were necessary for her support. It is claimed by the plaintiffs—and, I think, correctly—that from the conduct of the parties an accounting between them by which there was due to the plaintiffs' testator the sum appearing on the books to his credit, and which, in the absence of fraud or mistake, he would be entitled to recover, could be presumed. If, however, the defendant could show that this amount was not actually due upon the termination of the co-partnership; that at that time, as between the parties, a much smaller sum was really due,—I think it clear that the defendant would have been entitled to an accounting of the co-partnership transactions, in which could be determined the amount which was actually due to the plaintiffs' testator. The facts shown upon the trial, and which were uncontradicted, satisfactorily proved that the defendant,—who was an aged woman, without business knowledge of any kind,—having succeeded to this business upon the death of her husband, had no actual knowledge of the condition of these books; was never at any time informed that there was any sum of money due to Blanchard, or that he claimed anything from her; that he was her trusted agent and manager, familiar with the business and its details, carrying it on without consultation with her, drawing all checks, making all purchases, conducting the manufacture of the goods sold by the business, having entire charge of the defendant's interest, and keeping the books himself, without communicating their contents to any one. It is quite true that the defendant's sons were employed in the business, one of them being employed in keeping some of the books; but the books containing these accounts of Blanchard themselves show that, during the period from the commencement of the co-partnership down to the time that Blanchard left the defendant's employ, they were exclusively in his handwriting, all entries made by him, and no statement of the accounts were submitted by him to his principal, the defendant. The presumption of an account, under these circumstances, cannot be said to be a strong one, and will yield very readily to proof that the accounts did not represent the real interest of the parties in the business at the time of the dissolution of the co-partnership. The relation which existed between Blanchard and the defendant was that of the strictest and most implicit trust and confidence. She received from the business such an amount as he chose to send her, leaving the entire management and control of it to him; and such entries in the books in his own favor, uncommunicated to the defendant, should be received with very great caution, as establishing any claim on his behalf, as against her. Assuming, however, that after this lapse of time such entries did establish a prima facie case which would justify a recovery against the defendant, she was certainly entitled to prove that these entries made by Blanchard were erroneous, and did not show the exact condition of the affairs of the business at the

time of the dissolution of the co-partnership, and that, as a matter of fact, there was at that time less actually due to Blanchard from the business than appeared from the account. The defendant assumed this burden upon the trial, and the books containing entries of the co-partnership affairs from the time of the formation of the co-partnership were introduced in evidence, with inventories, made by Blanchard, showing the condition of the business at the end of each year. It appeared from the inventory of January 1, 1874, that the stock on hand, including machinery, blocks, and rollers, was valued at $49,238.82. The machinery was valued at $12,830, the blocks cut prior to January 1, 1873, were inventoried at $6,196.28, and the blocks cut during the year 1873 were valued at $1,946.73. Thus, the blocks and rollers were inventoried as of the 1st of January of that year at $8,142.45.

It is quite apparent that the interest of Blanchard at that time in this business depended upon a correct value being placed upon this inventory of the machinery, blocks, and rollers used in this business. The parties, however, having by their co-partnership articles fixed their proportion of this interest, we will assume that at that time the property was of the value stated. Under the co-partnership articles, the parties were to divide the profits equally. The inventories of the succeeding years show that, in regard to these blocks and rollers, the amount found to be the value of the blocks and rollers on hand at the end of each year was ascertained by taking the value as appeared upon the preceding inventory, and from that deducting 20 per cent., as the deterioration during the year. To that was added the amount paid for new blocks and rollers cut during the year. Thus, two amounts, together, were inserted as the value of the blocks at the time of taking the inventory. Thus, the inventory of January 1, 1875, fixed the then value of such blocks and rollers by taking the sum of $8,142, being the amount of the inventory of January 1, 1874, at which the blocks were valued; 20 per cent. was deducted, and to it was added the sum of $3,642, being the sum paid for new blocks during the year 1874. The blocks then on hand, January 1, 1875, were stated to be of the value of $10,156. This was credited to the merchandise account as the value of the stock, which on the 1st of January, 1875, was fixed at $49,708.70. This practice was continued each year until the close of the co-partnership, December 31, 1880, when the inventory showed that the blocks and rollers were valued at $20,682, being an increase of $12,486. The merchandise account was kept as follows: At the beginning of each year there was charged to it the balance of the merchandise account of the preceding year, which represented the value of the merchandise on hand, including the machinery, blocks, and rollers, valued as before stated. On the last day of each month there were credited and charged the accounts and cash received and paid out during the month; and on December 1st there was credited the amount of stock on hand, including merchandise, machinery, blocks, and rollers, as its value appeared by the new inventory made up at the end of each year, and the balance of this account was then cred-

ited to profit and loss. Thus, in each year the difference between the amount found as the value of the blocks and rollers over that of the preceding year, i. e. the increase of the value of these blocks and rollers, would increase the balance to the credit of the merchandise account, and thus increase the amount of the profits to be credited to each of the partners. The merchandise account for the year 1874 is printed in full in the case. On January 1, 1874, the amount charged to stock was $49,232.82; and, by turning to the inventory of January 1, 1874, it appears that this was the amount that the inventory showed to be the value of the stock on hand at that date. On December 31, 1874, there was credited in this account to stock $49,708.70; and on turning to the inventory of January 1, 1875, which includes the value of the machinery, blocks, rollers, etc., it will be seen that this is the amount as appeared by that inventory, including such machinery, blocks, and rollers of the stock on hand then. For the year 1874 the balance of that account was credited to profit and loss, showing a profit during that year of $26,231.87. The profit and loss account was made by crediting it with this balance from the merchandise account, charging to it sundry accounts that were marked off as not collectible, the expenses of the business during the year, and dividing the difference between Blanchard and the defendant. Thus, in each year was credited to Blanchard one-half of the increase of the value of the machinery, blocks, and rollers, as inventoried on the 1st day of January, so that at the end of the co-partnership, December 31, 1880, when the books were made up, this amount then due upon the books to Blanchard was based upon the fact that the old blocks and rollers made between the 1st of January, 1874, and the 31st of December, 1879, were worth $14,228. Now, the evidence shows conclusively that the blocks and rollers then in use, with the exception of those that were made for the current year, were of no substantial value at that time. The evidence of the defendant and others in the wall-paper business shows that the method of the business during all this period was as follows: The business year commenced in September, and lasted until the following May. During the summer the blocks and rollers for the printing of the wall paper were made, and were used during the succeeding year, beginning on the 1st of September. At the end of that business year, in May, the blocks and rollers were discarded, new ones being made for the following year, though in some cases, when a roller was 15 inches or over in diameter, it was cut over, and used again the following year; but even then it was substantially of no value, or only of the value of a new block of wood, costing from 50 cents to $1. These blocks and rollers were never used for two successive years, as each year the style of the wall paper changed so that in all of the other large houses it was customary to charge off at the end of each year the cost of the blocks and rollers used for that year as an expense, not considering them at the end of the year of any value. It will thus be seen that, at the close of the year 1880, Blanchard had been credited with one-half of the increase of the value of these old blocks, which were valueless. The amount

at which they were valued was $6,085.55, and one-half of that, being $3,042.77, should be deducted from the amount that appeared in the books to be due to him at the time of the termination of the co-partnership. It also appeared by the inventory that the blocks and rollers cut in 1880 were valued at $6,400. This inventory was taken as of January 1, 1881, and the season was then more than half ended. These blocks had been used for more than half a year. They were valued in each of the inventories at their cost, and thus the plaintiff was credited, on the dissolution of the firm, with one-half of the total cost of the blocks which had been used for more than six months. As the life of these blocks—if that term may be used—lasted only until the end of the business year, which would be in May, 1881, it would be manifestly unjust, in a transfer of these blocks to the defendant, to compel her to pay for them the full cost, as the business had the use of the blocks for more than one-half of the year, and Blanchard had been credited with his share of the profits realized from them during that period. There is evidence in the case which would justify a finding that on the 1st of January of each year the blocks which had been cut for use for that year were worth about one-half of their cost value; that is, a fair estimate of their then value would be one-half of their cost at the beginning of the business year. So the defendant should have been charged, as of the value of the blocks cut during the year 1880, one-half of their cost, instead of their full cost. Such one-half of their cost would be the sum of $3,200, instead of $6,400, as charged in the account; and as one-half of this excess, namely, $1,600, was credited to Blanchard, that amount should also be deducted from the balance due him on the books. There should therefore be deducted these two amounts, aggregating $4,642.77, from the sum of $14,651.-92, as due to Blanchard January 1, 1881, leaving due to Blanchard as of that time the sum of $10,009.15. The learned referee, in his opinion, seems to assume that the expenses incurred in making the new blocks and rollers were included in the expense account, although he says that there was no evidence to show either that they were or were not. It seems to me that in this he overlooked the fact that in the inventory made up in each year, which is the basis of the amount with which the merchandise account is credited as the stock at the end of the year, the expense of cutting the new blocks is included so as to increase by such expense the value of the stock credited to the merchandise account; and there the credit to Blanchard was increased each year by the increase in the stock account caused by the increased value placed upon these blocks and rollers, which were in fact valueless.

We have carefully examined the testimony, but do not think the defendant has established any other error in the account which would justify us in directing any further credit to her. There was some evidence as to the deterioration of the machinery each year, but there is nothing to show that such deterioration was not allowed for in the inventory as made and entered in the books. Nor does it appear that the amounts charged off for bad debts should, at the

time, have been larger. As to the remaining questions in the case, we think the referee has correctly disposed of them in his very satisfactory opinion, and that a further discussion is unnecessary.

The judgment should therefore be modified by deducting from the amount found due to Blanchard on the 1st day of January, 1881, the sum of $4,642.77, and as modified affirmed; no costs of this appeal to be allowed to either party.

BARRETT, J., concurs.